1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          EASTERN DISTRICT OF CALIFORNIA

9

10    AMAZING INSURANCE, INC, a Georgia
      corporation,
11                                                      No. 2:19-cv-01349-TLN-CKD
                          Plaintiff,
12
                   v.                                   **ORDER**
13
14    MICHAEL A. DiMANNO, an individual
      and ACCUIRE, LLC, a Florida limited
15    liability company,

16                        Defendants.
17    _____

18    MICHAEL A. DiMANNO, an individual
      and ACCUIRE, LLC, a Florida limited
19    liability company,

20
                          Counterclaim Plaintiffs,
21
                   v.
22
23
      VIKASH JAIN, an individual, GERALD
24    DOUGLAN ANDERTON, an individual,
      KARA CHILDRESS, an individua, and
25    ALEX Campos, an individual,

26
                          Third-Party Defendants.
27

28

1

Presently, before the Court is Plaintiff and Counter-Defendant Amazing Insurance, Inc.'s ("Plaintiff" or "Amazing Insurance") motion for preliminary injunction or in the alternative to appoint a receiver.  (ECF No. 10.)  Defendants and Counter-Claimants Accuire, LLC ("Accuire") and Michael A. DiManno ("DiManno") (collectively, "Defendants") oppose the motion (ECF Nos. 26, 28).  Plaintiff has filed a reply.  (ECF No. 30.)

Also before the Court is Plaintiff and Third-Party Defendants Vikash Jain ("Jain"), Gerald Douglas Anderton ("Anderton"), Alex Campos ("Campos"), and Kara Childress's ("Childress") (collectively, "Third-Party Defendants") motion to dismiss Defendants' third-party verified complaint.  (ECF No. 16.)  Defendants oppose the motion.  (ECF No. 29.)

For the reasons set forth below, Plaintiff's motion for preliminary injunction (ECF No. 10) is DENIED, and Third-Party Defendants' motion to dismiss (ECF No. 25) is GRANTED in part and DENIED in part.

## I.    BACKGROUND

Plaintiff initiated the instant action on July 18, 2019, (ECF No. 1), and amended its complaint on July 23, 2019 (ECF No. 6) ("FAC").  On July 24, 2019, Plaintiff filed a motion for temporary restraining order (ECF No. 7), which the Court denied (ECF No. 8.)  Plaintiff then filed its motion for preliminary injunction.  (ECF No. 10.)

On September 11, 2019, Defendants filed an amended answer with counterclaims against Plaintiff as well as Third-Party Defendants.  (ECF No. 16.)  Plaintiff and Third-Party Defendants have filed a motion to dismiss the counterclaims.  (ECF No. 25.)

At the crux of the parties' dispute is whether a Binding Letter of Understanding ("LOU") is enforceable.  The LOU sought to establish a contract that would transfer seventy-five percent of the stake in Accuire to Plaintiff.  Plaintiff argues that the LOU was binding in nature and that the transfer occurred.  Defendants argue that the LOU did not include consideration sufficient for contract formation, and even if the terms of the LOU were sufficient to establish a contract, Campos, Jain, and Anderton failed to perform pursuant to its terms.  The Court will summarize each sides' respective positions as outlined in their complaints.

///

A.     Plaintiff's FAC

In its FAC, Plaintiff alleges breach of contract, breach of fiduciary duties, conversion, and breach of the implied covenant of good faith and fair dealing.  (ECF No. 6 ¶¶43–64.)  The FAC also requests declaratory relief pursuant to the Declaratory Judgment Act.  (*Id.* ¶¶ 36–42.)  The FAC describes a business dispute over the ownership of Accuire and its wholly owned subsidiaries which are "staffing companies and professional employer organizations."  (*Id.* ¶ 7.)  Accuire is allegedly a Florida company with a principal place of business in Folsom, California.  (*Id.* ¶ 3.)

Plaintiff claims it purchased a seventy-five percent ownership stake in Accuire pursuant to the LOU executed in November 2016.  (*Id.* ¶ 8.)  DiManno owned the remaining twenty-five percent of Accuire and served as its Chief Executive Officer.  (*Id.* ¶¶ 9–10.)  The FAC alleges Accuire operated pursuant to the terms of an "Amended Operating Agreement," which contemplated that corporate action could be taken without an in-person meeting so long as a sufficient number of Accuire's members consented in writing.  (*Id.* ¶ 11; ECF No. 6-2 at 8.)  The FAC further alleges Plaintiff and its owner, Campos, are "sole guarantors for several of Accuire's obligations based on DiManno's lack of creditworthiness to secure the obligations alone."  (ECF No. 6 ¶ 12; *see also* ECF No. 6-1 at 6–7 (setting forth assumption by Plaintiff of certain obligations of Accuire in connection with Plaintiff's purchase of controlling membership interest in November 2016).)

On March 30, 2019, Plaintiff, Accuire, and DiManno allegedly executed a term sheet that contemplated Accuire buying out Plaintiff's seventy-five percent interest in Accuire.  (ECF No. 6 ¶ 13; ECF No. 6-5 at 3–4.)  The term sheet acknowledged that as of the date of its execution, Plaintiff was a "75% owner for Accuire" and DiManno was a "25% owner of Accuire before this transaction and shall be the 100% owner" of Accuire on the closing date.  (ECF No. 6-5 at 2–3.)  Among the numerous other terms, the term sheet set forth that Accuire would pay a $350,000 down payment by July 1, 2019, as a condition of closing.  (ECF No. 6 ¶ 13; ECF No. 6-5 at 3.)  The FAC alleges this down payment was never paid by Accuire or DiManno, which means the transfer of Accuire's majority membership interest from Plaintiff to Accuire and DiManno never

3

occurred.  (ECF No. 6 ¶ 14.)

Plaintiff alleges the failure of Accuire and DiManno to produce the anticipated $350,000 down payment — along with the fact that Plaintiff knew Accuire currently had unpaid debts and other financial obligations totaling over a million dollars, some of which could subject Plaintiff and Campos to direct liability if not paid or settled — caused Plaintiff to set a special meeting of Accuire's members for July 15, 2019, to address Accuire's management and financial condition. (ECF No. 6 ¶¶ 15–18; ECF No. 7-1 at 2–3.)  However, DiManno allegedly did not attend the July 15 meeting and allegedly called the police on Plaintiff's representative —Jain — who had arrived at Accuire's office for the meeting.  (ECF No. 6 ¶¶ 19–24.)

After the meeting adjourned without any action being taken, Plaintiff allegedly exercised its rights under the amended operating agreement to take corporate action by executing a "Written Consent of Members Holding Majority Units."  (ECF No. 6 ¶ 27.)  Plaintiff, through Campos as its President, executed the written consent on July 15.  (ECF No. 6-11 at 5.)  This written consent purported to terminate DiManno's employment as Accuire's Chief Executive Officer ("CEO") and to appoint a new Board of Directors consisting of Campos, Jain, and DiManno.  (ECF No. 6 ¶ 27.)  The written consent also purported to give Jain authority to: (1) negotiate with some of Accuire's creditors regarding outstanding notes owed to them by Accuire; (2) engage a consultant to "reduce unnecessary expenses"; (3) notify Accuire's vendors, its bank, its labor union, its landlord, and an insurance company of Accuire's new management structure; (4) require two signatures on any company check and for all outgoing wires and financial transfers; and (5) take over Accuire's e-mail system.  (ECF No. 6-11 at 3.)  The written consent also contemplated that Accuire's new management would either hire an audit firm to undertake a forensic accounting, seek additional capital, or seek to sell Accuire.  (*Id.*)

### B.    Defendants DiManno and Accuire's Third-Party Verified Complaint

Defendants, in a third-party complaint filed against Plaintiff and Third-Party Defendants, allege DiManno is a 49% owner of Accuire, and the remaining owners of Accuire are three companies: KaiserKane; CAPM; and Gardner (collectively referred to in the complaint as the "Bean Team").  (ECF No. 16 at 9, ¶ 13.)  Defendants allege the Bean Team operated Accuire

4

from January 2015 onward with DiManno as the only CEO for it and all its subsidiaries.  (ECF No. 16 at 9–10, ¶ 13.)

Defendants allege in 2016, DiManno and the Bean Team discussed the need for Accuire and its subsidiaries to obtain a large deductible workers' compensation policy which would require millions of dollars in collateral.  (*Id.*)  Because the Bean Team did not have the necessary capital, DiManno began looking for a buyer to secure funding for Accuire to provide the capital needed to obtain the policy.  (*Id.* at 10, ¶ 15.)

In May 2016, Jain approached DiManno and suggested he had funds and wanted to begin buying companies.  (*Id.*)  Jain represented that he, Anderton, and Campos could fund Accuire in exchange for ownership shares.  (*Id.* at 10, ¶ 16.)  In June 2016, DiManno presented to Jain, Anderton, and Campos regarding Accuire's business in Campos's offices in Duluth, Georgia.  (*Id.* at 11, ¶ 17.)  During the initial conversations, DiManno alleges he repeatedly told Campos, Jain, and Anderton he was not interested in selling his personal 49% share in Accuire, but only wanted to sell the Bean Team's 51% share.  (*Id.* at 11–12, ¶ 20.)  Jain, Campos, and Anderton told DiManno that to invest they would need to obtain 75% of Accuire.  (*Id.*)  According to DiManno, the original deal was that Jain, Campos, and Anderton would purchase half of DiManno's 49% and all of the Bean Team's 51%.  (*Id.* at 12, ¶ 21.)  Following the presentation, Campos allegedly shook DiManno's hand and told him they had a deal stating, "We are going to be partners," and "It is going to be amazing."  (*Id.* at 11, ¶ 17)

DiManno alleges the terms of the initial deal continued to change.  First, in October 2016, Campos allegedly informed DiManno that Campos's shell company, Amazing Insurance, would be used as the vehicle for the deal with Jain, Campos, and Anderton as ones contributing funds.  (*Id.* at 11, ¶ 18.)  Next, Jain, Campos, and Anderton allegedly asked to purchase half of Accuire's membership interests and to execute a promissory note with the Bean Team to pay for their interests over time — requiring Jain, Anderton, and Campos to provide less money up front.  (*Id.* at 12, ¶ 21.)  DiManno alleges that by the time the deal was set to close, the LOU stated that Accuire would buy out the Bean Team and Amazing Insurance would put down $300,000 cash out of a total purchase price of $2.7 million.  (*Id.* at 12, ¶ 22.)  Amazing Insurance would pay the

5

rest, over time, to Accuire, which would cover Accuire's note payments to the Bean Team.  (*Id.*)

DiManno allegedly communicated his frustrations to Campos, Jain, and Anderton via email stating that "You three are my partners not Amazing."  (*Id.* at 12–13, ¶ 23.)  According to Defendants, the LOU stated on the day of closing: (1) Amazing Insurance would pay $200,000 to the Bean Team and $100,000 to DiManno; (2) the Bean Team would transfer their ownership shares to Amazing Insurance; (3) Accuire would pay each of the Bean Team entities a down payment for their ownership interests; (4) Accuire would become obligated to pay each of the Bean Team entities a certain sum of money, which they would pay over 36 months to complete payment for the Bean Team's ownership interest; (5) Accuire would buy DiManno's ownership interest by paying a down payment and then committing to making payments over 36 months; and (6) all payments made under the subject notes held by the Bean Team and DiManno were to be reimbursed to Accuire by Amazing Insurance.  (*Id.* at 14, ¶ 27.)

According to Defendants, the reimbursements from Amazing Insurance to Accuire never happened.  (*Id.*)  Defendants further allege the LOU did not contemplate Amazing Insurance's or Campos's obligation to make payments beyond the initial $300,000 in exchange for receiving all of the membership units at closing.  (*Id.* at 14, ¶ 28.)  Defendants allege the LOU did not describe the way in which Amazing Insurance would actually pay the $2,400,000 balance, but simply stated that Amazing Insurance would make payments "On a monthly basis as stated in Sections 2, 3, 4, and 5 of the LO[U]."  (*Id.* at 15, ¶ 33 (internal citations omitted).)  Defendants state that Sections 2, 3, 4, and 5 only discuss payments made by Accuire to the Bean Team.  (*Id.*)  According to Defendants, as stated in the LOU, Jain, Campos, and Anderton were "hoping to purchase Accuire mostly with Accuire's own money and only with $300,000 of Amazing Insurance's money," and this shows a "complete lack of consideration."  (*Id.*)  Moreover, Defendants contend Amazing Insurance failed to reimburse Accuire for payments Accuire made as required by the LOU.  (*Id.*)

Defendants allege that as result of the omissions from the LOU, the parties entered into a "First Addendum" aimed to correct said omissions.  (*Id.* at 17–18, ¶¶ 44, 45.)  The First Addendum provided that Campos, at closing, along with Amazing Insurance, would execute a

promissory note to the Bean Team and DiManno for the remaining $2,400,000 purchase price.

(*Id.* at 18, ¶ 46.)  Further, Anderton, Campos, and Jain executed an indemnification and guaranty

(the "Guaranty"), granting full and absolute indemnification to DiManno and the Bean Team for

any amounts owed as a result of the purchase of the membership units of Accuire.  (*Id.* at 18, ¶

49.)  Defendants allege the guarantors failed to make payments covering the notes in breach of

the Guaranty.  (*Id.* at 18–19, ¶ 50.)

Defendants allege that shortly after the LOU transaction closed, Accuire ran out of funds

because Jain, Campos, Anderton, and Amazing Insurance failed to make the requisite payments.

(*Id.* at 19, ¶ 53.)  Defendants allege that between February 3, 2017, and July 26, 2017, Jain,

Anderton, and Campos sent Accuire $500,000, which was used to pay bills and did not satisfy

their obligation to Accuire.  (*Id.* at 19, ¶ 54.)

Defendants allege Campos installed Jain, Anderton, and Childress in positions of power at

Accuire, which led to these individuals siphoning money from Accuire's bank accounts to

Campos, Amazing Insurance, and Campos-owned entities.  (*Id.* at 20, ¶ 58.)  Defendants allege

that because of the siphoning and Amazing Insurance's failure to provide funding as agreed,

Defendants were forced to take loans from at least two Campos-owned entities, Vensure and

CenCal Holdings.  (*Id.* at 21–22, ¶¶ 63–66.)

Defendants allege that in January 2018, Campos told DiManno he planned to sell his

portion of Accuire to Vensure so Vensure could fund Accuire and turn it profitable.  (*Id.* at 22, ¶¶

69, 70.)  In October 2018, DiManno told Vensure that Accuire needed to be funded.  (*Id.* at 23, ¶

71.)  DiManno alleges that on March 30, 2019, Accuire, Amazing Insurance, DiManno, Campos,

a non-party, and Accuire's subsidiaries executed a term sheet for the acquisition of all ownership

interests in Accuire.  (*Id.* at 23, ¶ 73.)  Pursuant to the term sheet, Accuire would buy back its

shares from Amazing Insurance as a means for DiManno to "save himself and his companies"

from Campos, Jain, and Anderton's "fraud and various breaches."  (*Id.* at 23–24, ¶¶ 73, 74.)  The

term sheet was not executed.  (*Id.* at 24, ¶ 79.)

On July 15, 2019, Campos attempted to convene a meeting for Accuire members, at which

DiManno's legal representative informed Campos that neither Amazing Insurance nor Campos

1  were owners of 75% of Accuire because of a failure of consideration.  (*Id.* at 24–25, ¶¶ 80, 81.)

2  Campos then sent his attorney and Jain to "take over" Accuire's office by creating a new board of

3  directors for Accuire consisting of Campos, Jain, and DiManno and directing Accuire to: (1)

4  terminate DiManno as CEO of Accuire; (2) negotiate with the Bean Team regarding the

5  outstanding notes owed; (3) conduct a forensic accounting of Accuire; (4) notify vendors and

6  labor unions of the "change of management"; (5) entertain offers for the sale of Accuire; (6)

7  impose "dual control" on wires and ACH transactions of Accuire's money; and (7) obtain control

8  of Accuire's electronic mail system.  (*Id.*  at 25, ¶ 82.)  Defendants allege that because the transfer

9  of membership units was never consummated, Campos had no authority to perform any of these

10  acts.  (*Id.* at 25, ¶ 83.)

11  **II.  MOTION FOR PRELIMINARY INJUNCTION**

12  A.  Standard of Law

13  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

14  showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555

15  U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).  "The

16  purpose of a preliminary injunction is merely to preserve the relative positions of the parties until

17  a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also*

18  *Costa Mesa City Emps. Ass'n v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The

19  purpose of such an order is to preserve the status quo until a final determination following a

20  trial."); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo

21  ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last

22  uncontested status which preceded the pending controversy.").

23  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed

24  on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

25  [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."

26  *Winter*, 555 U.S. at 20.  A plaintiff must "make a showing on all four prongs" of the *Winter* test

27  to obtain a preliminary injunction.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

28  (9th Cir. 2011).  In evaluating a plaintiff's motion for preliminary injunction, a district court may

8

1    weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach.  *Id.*  A

2    stronger showing on the balance of the hardships may support issuing a preliminary injunction

3    even where the plaintiff shows that there are "serious questions on the merits . . . so long as the

4    plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the

5    public interest."  *Id.*  Simply put, plaintiffs must demonstrate, "that [if] serious questions going to

6    the merits were raised [then] the balance of hardships [must] tip[ ] sharply" in [p]laintiffs' favor

7    in order to succeed in a request for preliminary injunction.  *Id.* at 1134–35.

8                    B.       <u>Analysis</u>

9            Plaintiff seeks to enjoin DiManno and Accuire from exercising control over Accuire

10    without Plaintiff's written consent and also seeks to require compliance with the Written Consent

11    executed by Plaintiff on July 15, 2019.  (ECF No. 10 at 1–2.)  Alternatively, Plaintiff requests the

12    Court appoint a "receiver" until this case is concluded.  (*Id.*)  Plaintiff's primary argument is that

13    allowing DiManno to continue exercising control over Accuire will result in significant damage

14    to its business reputation, credit profile, and goodwill.  (*See* ECF No. 10-1.)

15                         *i.   Irreparable Harm*

16            Plaintiff's instant motion for preliminary injunction has nearly identical allegations of

17    irreparable harm as its request for temporary restraining order, which this Court denied.  (*See*

18    ECF Nos. 10, 7, 8.)  Plaintiff only adds that "within the last week, Defendants have restricted

19    Plaintiff's ability to view the banking activity for Accuire . . . which serves no legitimate business

20    purpose . . . ."  (ECF No. 10-1 at 9.)  The Court will not reiterate its previous finding Plaintiff

21    failed to show irreparable harm and finds it equally applicable here to the identical allegations.

22    (*See* ECF No. 8.)  As to Plaintiff's additional claim, Plaintiff fails to allege — in any capacity —

23    how this amounts to Plaintiff being irreparably harmed.  (ECF No. 10-1 at 9.)  Accordingly, the

24    Court finds Plaintiff has failed to show a likelihood of irreparable injury.  Therefore, the Court

25    need not and does not address Plaintiff's arguments as to the other prongs of the *Winter* test.  *See*

26    *Alliance*, 632 F.3d at 1132, 1135 ("[A] preliminary injunction requires a showing of likely

27    irreparable injury.").

28    ///

9

*ii.*     *Receiver*

Plaintiff alternatively requests the Court appoint a neutral third-party receiver to govern and control Accuire's affairs.  (ECF No. 10-1 at 9.)  "Under federal law, appointing a receiver is an extraordinary equitable remedy, which should be applied with caution."  *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (internal quotations omitted).  In considering whether to appoint a receiver, courts look to: (1) whether the party seeking the appointment has a valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent conduct by the defendant; (3) whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; and, (7) whether the plaintiff's interests sought to be protected will in fact be well-served by receivership.  *Id.*

Plaintiff states the law and then argues in entirety that:

> In this case, [P]laintiff as the majority owner of Accuire, LLC, has a valid claim, and the property of Accuire is in imminent danger of being lost, concealed, diminished in value, or squandered.  Further, as noted abovec [sic], within the last week, Defendants have restricted Plaintiff's ability to view the banking activity for Accuire with its bank accounts at Bank of America, conduct which serves no legitimate business purpose and is indicative of fraudulent or improper behavior on Defendants' part.

(ECF No. 10-1 at 10.)

The Court will not reiterate the reasoning in its determination that Plaintiff has failed to demonstrate the possibility of irreparable injury.  As to the remaining factors, Plaintiff's single paragraph without any further explanation is insufficient to warrant such an extraordinary remedy that should only be applied with caution.  Accordingly, the Court declines to appoint a receiver.

**III.**      **MOTION TO DISMISS**

    A.      <u>Standard of Law</u>

A motion to dismiss for failure to state a claim upon which relief can be granted under

10

1   Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of a complaint.

2   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Rule 8(a) requires that a pleading contain

3   "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

4   Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  Under notice pleading in

5   federal court, the complaint must "give the defendant fair notice of what the . . . claim is and the

6   grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal

7   citation and quotations omitted).  "This simplified notice pleading standard relies on liberal

8   discovery rules and summary judgment motions to define disputed facts and issues and to dispose

9   of unmeritorious claims."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

10      On a motion to dismiss, the factual allegations of the complaint must be accepted as true.

11   *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court must give the plaintiff the benefit of every

12   reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail*

13   *Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege

14   "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to

15   relief."  *Twombly*, 550 U.S. at 570 (internal citation omitted).

16      Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of

17   factual allegations."  *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).

18   While Rule 8(a) does not require detailed factual allegations, "it demands more than an

19   unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A

20   pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

21   elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678

22   ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

23   statements, do not suffice.").  Thus, '[c]onclusory allegations of law and unwarranted inferences

24   are insufficient to defeat a motion to dismiss for failure to state a claim."  *Adams v. Johnson*, 355,

25   F.3d 1179, 1183 (9th Cir. 2004) (citations omitted).  Moreover, it is inappropriate to assume the

26   plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws

27   in ways that have not been alleged."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State*

28   *Council of Carpenters*, 459 U.S. 519, 526 (1983).

1    Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough

2    facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim

3    has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

4    reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

5    680. While the plausibility requirement is not akin to a probability requirement, it demands more

6    than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. This plausibility

7    inquiry is "a context-specific task that requires the reviewing court to draw on its judicial

8    experience and common sense." *Id.* at 679. Thus, only where a plaintiff fails to "nudge [his or

9    her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly

10   dismissed. *Id.* at 680 (internal quotations omitted).

11   In ruling on a motion to dismiss, a court may consider only the complaint, any exhibits

12   thereto, and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201.

13   *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Isuzu Motors Ltd. v.*

14   *Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1042 (C.D. Cal. 1998); *see also Daniels-*

15   *Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (the court need not accept as true

16   allegations that contradict matters properly subject to judicial notice).

17   If a complaint fails to state a plausible claim, "'[a] district court should grant leave to

18   amend even if no request to amend the pleading was made, unless it determines that the pleading

19   could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122,

20   1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995));

21   *see also Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in

22   denying leave to amend when amendment would be futile). Although a district court should

23   freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to

24   deny such leave is 'particularly broad' where the plaintiff has previously amended its

25   complaint[.]" *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir.

26   2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

27           B.   <u>Analysis</u>

28   Third-Party Defendants and Plaintiff have filed a motion to dismiss the Third-Party

1   Complaint by Defendants.[1]  (ECF No. 25-1.)  Defendants allege the following claims: (1) fraud

2   against Amazing Insurance, and separately, Campos, Jain, and Anderton; (2) conversion against

3   all Third-Party Defendants; (3) civil conspiracy against all Third-Party Defendants; (4) breach of

4   contract for the Guaranty against Anderton, Jain and Campos; (5) veil piercing against Amazing

5   Insurance and Campos; and (6) declaratory relief against Amazing Insurance and Campos.  (ECF

6   No. 16 at 26–31.)  The Court will address the parties' arguments regarding each claim in turn.

7                           *i.   Fraud*

8             Third-Party Defendants argue Defendants have failed to state a claim for fraud.  (ECF No.

9   25-1 at 10.)  A viable fraud claim must aver: (1) the defendant made a false representation as to a

10  past or existing material fact; (2) the defendant knew the representation was false at the time it

11  was made; (3) in making the representation, the defendant intended to deceive the plaintiff; (4)

12  the plaintiff justifiably and reasonably relied on the representation; and (5) the plaintiff suffered

13  resulting damages.  *Ragland v. U.S. Bank National Association*, 209 Cal. App. 4th 182, 199–200

14  (2012).  Federal courts apply state law to determine whether the elements of fraud have been

15  pleaded adequately to state a cause of action, but Rule 9(b) requires that the circumstances

16  establishing fraud must be stated with sufficient particularity.  *Vess v. Ciba-Geigy Corp. USA*,

17  317 F.3d 1097, 1103 (9th Cir. 2003).  Specifically, Rule 9(b) requires "[i]n alleging fraud or

18  mistake, a party must state with particularity the circumstances constituting fraud or mistake.

19  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

20  Fed. R. Civ. P. 9(b).  The allegations underlying a fraud claim must be "specific enough to give

21  defendants notice of the particular misconduct . . . so that they can defend against the charge."

22  *Vess*, 317 F.3d at 1106 (internal quotation marks omitted).  "Averments of fraud must be

23  accompanied by 'the who, what, when, where, and how' of the misconduct charged."  *Id.*  (citing

24  *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)).  "[A] plaintiff must set forth more than the

25  neutral facts necessary to identify the transaction.  The plaintiff must set forth what is false or

26  misleading about a statement, and why it is false."  *Id.*  (citing *Decker v. GlenFed, Inc.*, 42 F.3d

27  _____

28  [1]       For ease, the Court refers to Third-Party Defendants and Plaintiff together as "Third-Party Defendants" for the purposes of the motion to dismiss.

                                        13

1   1541, 1548 (9th Cir. 1994)).

2          Defendants bring a claim for fraud against Campos, Jain, and Anderton, in which they

3   argue Campos, Jain, and Anderton made numerous misrepresentations and omissions including

4   that they: (1) intended to complete the purchase of the membership units in Accuire; (2) had the

5   ability, or failed to disclose their inability, to fund the purchase of such membership units, either

6   directly as individuals or indirectly through Amazing Insurance; and (3) were co-owners of

7   Amazing Insurance.  (ECF No. 16 at 27, ¶ 93.)  Defendants further allege Campos, Jain, and

8   Anderton misrepresented the corporate structure of Amazing Insurance, as well as their status as

9   owners, specifically that the Third-Party Defendants misrepresented that Amazing Insurance was

10  a limited liability company when it was in fact a corporation.  (*Id.* ¶ 94; ECF No. 25-1 at 1.)

11  Defendants state that Campos, Jain, and Anderton had knowledge of the falsity of their

12  misrepresentations and intended to defraud and induce reliance by DiManno and Accuire.  (ECF

13  No. 16 at 27, ¶¶ 95–96.)  Defendants bring a separate claim for fraud against Amazing Insurance

14  with the same set of allegations.  (*See Id.* ¶ 100.)

15         Third-Party Defendants argue the fraud claims must be dismissed because they "do not

16  support the conclusion that the representations were false."  (ECF No 25-1 at 11.)  Third-Party

17  Defendants appear to assert that their alleged representations cannot be false because DiManno

18  "reluctantly agreed to the terms of the LOU" and the "deal was completed."  (ECF No. 25-1 at

19  11.)  However, Defendants challenge whether the deal was agreed to at all.  (*See* ECF No. 16 at

20  15, ¶ 33 (discussing how the LOU was "void" and incomplete because of the "lack of

21  consideration").)  Much of what Third-Party Defendants seek is for the Court to determine

22  whether in fact, the statements in the Third-Party Complaint are false.  (*See generally* ECF No.

23  25-1 at 10–11.)  This is inappropriate at the pleading stage, where the allegations of the complaint

24  must be taken as true.

25         Third-Party Defendants fail to point to *any* legal authority — other than the recitation of

26  the elements of fraud — to support its argument that Defendants' allegations are insufficient.  *Id.*

27  As such, Third-Party Defendants have failed to provide any convincing argument that

28  Defendants' fraud claim should be dismissed, and their motion on this basis is DENIED.

14

*ii. Conversion*

"Conversion is the wrongful exercise of dominion over the personal property of another." *Taylor v. Forte Hotels Int'l*, 235 Cal. App. 3d 1119, 1124 (1991). "The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015). To allege a conversion claim, a plaintiff must first allege ownership or a right to possession of the property. *Lee*, 61 Cal. 4th at 1240.

Defendants allege Accuire possessed and had a right to possess its own funds and membership units and Third-Party Defendants intentionally interfered with Accuire's property by taking possession of at least $1,011,820 and membership units. (ECF No. 16 at 29.) Third-Party Defendants argue the conversion claim must be dismissed because the allegations do not state there was a "wrongful exercise of dominion by any of the Third-Party Defendants or Amazing." (ECF No. 25-1 at 11.) They also argue that only DiManno can bring a claim for conversion regarding the shares of Accuire, and that because DiManno agreed to the terms of the LOU he cannot now state that Amazing Insurance had no rights to Accuire's shares. (*Id.* at 12.) Finally, Third-Party Defendants argue Defendants failed to describe Third-Party Defendants' actions as wrongful. (*Id.*)

As to Third-Party Defendants' argument that only DiManno can bring a claim regarding membership units, Third-Party Defendants do not explain why Accuire cannot make a claim regarding its own membership units nor do they provide *any* case law supporting this argument. (*See* ECF No. 25-1 at 11–12.) As to Third-Party Defendants' argument that because DiManno agreed to the terms of the LOU he cannot now state that Amazing Insurance had no rights to Accuire's shares, Third-Party Defendants fail to contemplate Defendants' allegations that the deal was in fact void due to a lack of compliance with the terms and consideration. Defendants point out that without the LOU, neither Amazing Insurance nor Third-Party Defendants had any right to exercise dominion over Accuire. (*See* ECF No. 29 at 15.) Finally, as to Third-Party Defendants' argument that Defendants failed to describe their actions as wrongful, the Court disagrees. In one instance Defendants describe Campos's actions as "sweeping" and state he was "emptying"

15

Accuire's accounts.  (ECF No. 16 at 19, ¶ 53.)  In another, Defendants accused Jain, Anderton, Campos, and Childress as "abusing" Accuire.  (*Id.* at ¶ 54.)  Third-Party Defendants cite to no case law stating that Defendants must use the words "wrongful" or "bad."  Nor do they explain how the alleged language fails to satisfy the "wrongful" element.  Here, Defendants have adequately pleaded the elements necessary for conversion, and Third-Party Defendants' motion to dismiss on these grounds is DENIED.

*iii.  Breach of Contract*

To sustain a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendants' breach; and (4) actual resulting damage to the plaintiff.  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

Third-Party Defendants argue the Court should dismiss Defendants' claim because Defendants have failed to allege any acts that could constitute a breach of the LOU and Defendants have not been damaged.  (ECF No. 25-1 at 13–14.)  In their third-party complaint, Defendants allege a breach of contract claim against Anderton, Jain, and Campos stating they along with Amazing Insurance entered into the Guaranty, which was a "binding contract, with Accuire and DiManno."  (ECF No. 16 at 30.)  Defendants state that Anderton, Jain, Amazing Insurance, and Campos breached the contract by failing to indemnify and guarantee the notes, which caused Accuire and DiManno damages.  (*Id.*)

As to whether the third-party complaint sufficiently alleged acts that could constitute a breach of the LOU, the complaint describes Third-Party Defendants' obligation under the LOU to deliver $2.7 million to Accuire and DiManno which included the $300,000 payment for closing and alleges that "[n]either Campos nor Amazing Insurance ever made the $300,000 payment."  (ECF No. 16 at ¶¶ 26, 39.)  The third-party complaint further states that the LOU required Amazing Insurance to repay Accuire, which Amazing Insurance failed to do.  (*Id.* at ¶ 27.)  The third-party complaint describes in detail how Amazing Insurance "continued to fail in its obligation to fund the LOU deal."  (*Id.* at ¶ 54.)  Third-Party Defendants did not reply to Defendants' opposition, nor have they provided any case law or support for their position.  Third-

16

1   Party Defendants failed to address the allegations or explain why they are insufficient to

2   withstand a motion to dismiss.

3           Third-Party Defendants also argue that Accuire has not been damaged by any alleged

4   breach of the Guaranty.  (ECF No. 25-1 at 14.)  The Court finds that Defendants have sufficiently

5   pleaded damages resulting from Third-Party Defendants' actions.  Accordingly, Third-Party

6   Defendants have failed, in their motion, to persuade the Court that Defendants' breach of contract

7   claim should be dismissed.  As such, the motion on this basis is DENIED.

8                                    *iv.  Civil Conspiracy*

9           Third-Party Defendants argue Defendants' claim for civil conspiracy must be dismissed

10  because it is not a "separate cause of action that can be asserted, but instead a theory under which

11  causes of action against one individual can be asserted against his co-conspirators."  (ECF No 25-

12  1 at 14.)  Defendants argue that Third-Party Defendants cite outdated case law, and that in 2006,

13  the California Supreme Court laid out the elements of civil conspiracy in *Rusheen v. Cohen*, 37

14  Cal. 4th 1048, 1062 (2006).  Third-Party Defendants have not replied.

15          In *Rusheen*, the California Supreme Court articulated that the elements of civil conspiracy

16  are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a

17  wrongful act done in furtherance of the common design.  *Id.*  Defendants further cite to case law

18  from federal courts within this circuit that have articulated these elements.  (ECF No. 29 at 20

19  (citing to *Philips Medical v. Medical Insights Diagnostics*, 471 F. Supp. 2d 1035, 1045 (N.D. Cal.

20  2007) ("If there was no claim for civil conspiracy, there would be no need to provide any

21  elements of such a claim."); *Gilbane Fed. V. United Infrastructure Projects Fzco*, 275 F. Supp.

22  3d. 1180, 1196 (N.D. Cal. 2017) (reiterating the elements of a civil conspiracy under California

23  law)).)

24          Third-Party Defendants' argument that civil conspiracy is not a claim under California

25  law is unavailing.  Without any further reasoning to support dismissal, the Court DENIES Third-

26  Party Defendants' motion on this basis.

27                                   *v.      Veil Piercing*

28          Third-Party Defendants argue Defendants' cause of action for "Veil Piercing" must be

                                              17

1   dismissed because there is no such cause of action under California law.  (ECF No. 25-1 at 14–

2   15.)  In opposition, Defendants state — for the first time — that the veil piercing claim is brought

3   under Georgia law where there is an independent cause of action.

4          "[D]ue to variances among state laws, failure to allege which state law governs a common

5   law claim is grounds for dismissal."  *Romero v. Flowers Bakeries*, LLC, No. 14-CV-05189-BLF,

6   2016 WL 469370, at *12 (N.D. Cal. Feb. 8, 2016) (citing *In re TFT-LCD (Flat Panel) Antitrust*

7   *Litig.*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011)).  In order to allege whether a claim has been

8   pleaded, Defendants must allege the applicable law.  Accordingly, the Court GRANTS Third-

9   Party Defendants' motion to dismiss the veil piercing claim with leave to amend.

10                          *vi.*      *Declaratory Relief*

11         Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy," the Court

12  "may declare the rights and other legal relations of any interested party seeking such declaration,

13  whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "This statute does not

14  create new substantive rights, but merely expands the remedies available in federal courts."  *Shell*

15  *Gulf of Mexico, Inc. v. Center for Biological Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014).

16  "To determine whether a declaratory judgment action presents a justiciable case or controversy,

17  courts consider 'whether the facts alleged, under all the circumstances, show that there is a

18  substantial controversy, between parties having adverse legal interests, of sufficient immediacy

19  and reality to warrant the issuance of a declaratory judgment.'"  *Id.*  (quoting *Md. Cas. Co. v. Pac.*

20  *Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

21         A claim for declaratory relief may be "unnecessary where an adequate remedy exists

22  under some other cause of action."  *Reyes v. Nationstar Mortg. LLC*, No. 15-CV-01109-LHK,

23  2015 WL 4554377, at *7 (N.D. Cal. July 28, 2015) (quoting *Mangindin v. Wash. Mut. Bank*, 637

24  F. Supp. 2d 700, 707 (N.D. Cal. 2009)).  However, "[t]he existence of another adequate remedy

25  does not preclude a declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57.

26  Ultimately, a critical question is whether the declaratory relief "will serve a useful purpose in

27  clarifying and settling the legal relations in issue."  *McGraw-Edison Co. v. Preformed Line*

28  *Prods. Co.*, 362 F.2d 339, 342 (9th Cir. 1966).

                                                18

Here, Defendants seek declaratory relief from the Court stating: (1) the LOU is null and void due to a lack of consideration; (2) the written consent is null and void for lack of authority; and (3) Amazing Insurance never became the owner of any shares in Accuire.  (ECF No. 16 at 26–27.)  Third-Party Defendants argue Defendants' declaratory judgment claims should be dismissed because: (1) the declarations sought by Defendants are contradictory to the allegations of the third-party complaint; (2) there is no immediacy sufficient to warrant declaratory judgment; and (3) the conversion claim provides Defendants with an adequate remedy.  (ECF No. 25-1 at 7–10.)

The Court finds Third-Party Defendants' arguments unavailing.  The Court DENIES Third-Party Defendants' motion to dismiss the declaratory judgment claim.  *See K. v. Adobe Sys. Inc.*, No. 17-CV-04595-LHK, 2018 WL 1812200, at *13 (N.D. Cal. Apr. 17, 2018) (declining to dismiss declaratory judgment claim when other claims survived a motion to dismiss); *Fitbit, Inc. v. Laguna 2, LLC*, No. 17-CV-00079-EMC, 2018 WL 306724, at *10 (N.D. Cal. Jan. 5, 2018) (stating the court has discretion to keep the declaratory judgment claim in the action).

**IV.  CONCLUSION**

For the aforementioned reasons, the Court hereby DENIES Plaintiff's Motion for Preliminary Injunction (ECF No. 10).

The Court further GRANTS in part and DENIES in part Plaintiff and Third-Party Defendants' Motion to Dismiss (ECF No. 25) as follows:

1.  Plaintiff and Third-Party Defendants' Motion to Dismiss for claims of Fraud, Conversion, Breach of Contract, Civil Conspiracy, and Declaratory Judgment is DENIED; and

2.  Plaintiff and Third-Party Defendants' Motion to Dismiss for Veil Piercing is GRANTED with leave to amend.

Defendants may file an Amended Third-Party Verified Complaint not later than thirty (30) days after the electronic filing date of this Order or choose to proceed on the non-dismissed claims.  Plaintiff and Third-Party Defendants shall file a responsive pleading not later than twenty-one (21) days after the electronic filing date of Defendants' Amended Third-Party

1    Verified Complaint, should one be filed.

2        IT IS SO ORDERED.

3    Date:  November 9, 2021

4

5    _____

6        Troy L. Nunley
         United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28